**2015 UT App 112**

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Plaintiff and Appellee,
*v.*
SHAWN H. MOORE,
Defendant and Appellant.

Opinion
No. 20130422-CA
Filed April 30, 2015

Third District Court, Salt Lake Department
The Honorable Katie Bernards-Goodman
No. 081908861

Lori J. Seppi and John B. Plimpton, Attorneys
for Appellant

Sean D. Reyes and Karen A. Klucznik, Attorneys
for Appellee

JUDGE JAMES Z. DAVIS authored this Opinion, in which JUDGES
J. FREDERIC VOROS JR. and JOHN A. PEARCE concurred as to Part I
and concurred in the result.

DAVIS, Judge:

¶1    Shawn H. Moore appeals from his convictions of four
counts of securities fraud, four counts of sale by an unlicensed
agent, and one count of pattern of unlawful activity. We agree
with Moore's argument that the jury instructions defining the
"willfulness" mens rea for the securities fraud charges and the
sale by an unlicensed agent charges were incomplete and
misstated the law. Accordingly, we reverse all of Moore's
convictions and remand for further proceedings in accordance
with this opinion.

BACKGROUND

¶2    Moore's convictions arise from investments various clients made in VesCor Capital, Inc. while Moore worked there. The details of the investments and Moore's relationship to the investments, however, are not central to our determination on appeal. Suffice it to say, counts one through eight against Moore represent the securities fraud charges and unlicensed agent charges and arise from four specific investments made by four different VesCor clients between December 2003 and January 2006. Count nine, the pattern of unlawful activity charge, alleges counts one through eight as predicate offenses and alleges three additional investments occurring in August 2001 and March and June 2003 (the time-barred investments) as predicate offenses. The State did not bring separate securities fraud and unlicensed agent charges against Moore for these additional investments because they fell outside of the statute of limitations.

¶3    Moore's primary argument on appeal is that the jury instructions defining the "willfulness" element of counts one through eight were incorrect and misleading. Moore also argues that Brian Glen Lloyd, a practicing attorney who testified for the State as a securities expert, impermissibly provided legal conclusions in his testimony. Additionally, Moore challenges the trial court's restitution order, arguing that the court failed to consider the mandatory statutory factors in calculating court-ordered restitution and that the court's requiring Moore to pay restitution for the time-barred investments was improper because those investments did not form a basis for his securities fraud or unlicensed agent convictions.

ISSUES AND STANDARDS OF REVIEW

¶4    "Generally, [w]hether a jury instruction correctly states the law presents a question of law which we review for

correctness." *State v. Cruz*, 2005 UT 45, ¶ 16, 122 P.3d 543 (alteration in original) (citation and internal quotation marks omitted). "[W]e look at the jury instructions in their entirety and will affirm when the instructions taken as a whole fairly instruct the jury on the law applicable to the case." *State v. Maestas*, 2012 UT 46, ¶ 148, 299 P.3d 892 (citation and internal quotation marks omitted).

¶5    Because we agree with Moore that the "willfulness" jury instructions were erroneous, we need not decide the other issues raised on appeal. This decision nonetheless addresses Moore's arguments to the extent that doing so may offer guidance for the trial court on remand.[1] *See Armed Forces Ins. Exch. v. Harrison*, 2003 UT 14, ¶ 38, 70 P.3d 35 ("[I]n the interest of judicial economy, a brief discussion of these issues is appropriate as guidance for the trial court on remand." (citation and internal quotation marks omitted)).

ANALYSIS

I. The Willfulness Jury Instruction

¶6    Moore's defense at trial focused on the willfulness element in both the securities fraud charges and the sale by an unlicensed agent charges. As charged, the securities fraud statute makes it unlawful for

---

1. Judge Voros and Judge Pearce concur only as to Part I of this decision and do not join in Part II, to the extent they disagree with the propriety of reaching issues that may arise on remand in this case. As a result, the discussion under Part II reflects the views of Judge Davis and is not a part of the majority decision.

> any person, in connection with the offer, sale, or purchase of any security, directly or indirectly to:
>
> . . .
>
> (2) make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading; or
>
> (3) engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

Utah Code Ann. § 61-1-1 (LexisNexis 2011). The sale by an unlicensed agent charges required the State to prove that Moore transacted "business in this state as a broker-dealer or agent" without a license. *Id.* § 61-1-3(1). This section "govern[s] both civil and criminal liability." *State v. Larsen,* 865 P.2d 1355, 1358 (Utah 1993). "To ascertain the elements of a criminal violation," we must read this section "in conjunction with section 61-1-21, which specifies the requisite mental state and penalties for a criminal violation." *Id.* Here, the mens rea required for both the securities fraud and unlicensed agent offenses is willfulness. *See* Utah Code Ann. § 61-1-21 (LexisNexis 2011).

¶7      A showing of willfulness, therefore, was required as to each of the nine charges against Moore. For counts one through eight, the jury was required to directly find that Moore acted willfully in relation to the specific elements of each charge. With count nine, the pattern of unlawful activity charge, the jury was required to find that Moore engaged in "at least three episodes of unlawful activity," which could include "the activity alleged in counts one through eight." *See id.* § 76-10-1602(2) (Supp. 2014) (defining "pattern of unlawful activity"); *id.* § 76-10-1603 (2012). In other words, Moore's conviction on count nine depended upon the jury's verdict for counts one through eight. The jury

could also determine that the time-barred investments constituted two of the "at least three episodes of unlawful activity" necessary for a conviction on count nine. But for the jury to rely on any of the time-barred investments in reaching its verdict on count nine, it was instructed that it had to determine whether Moore "willfully" omitted or made untrue statements of material fact or "willfully" sold securities without a license with regard to those particular investments. Accordingly, the mens rea of willfulness pervaded the trial, and Moore's convictions on all nine counts depended on the jury's understanding and application of that concept.

¶8 Jury instructions 23, 43, and 50 address the mens rea required to sustain Moore's convictions. Moore argues that Instruction 50 was "legally incorrect" and that "Instructions 23 and 43, when read together, were incomplete and misleading." We address each argument in turn.

A. Instruction 50

¶9 Instruction 50 states,

In securities law, salespeople are under a duty to investigate.

A salesperson cannot deliberately ignore that which he has a duty to know and recklessly state facts about matters of which he is ignorant. A salesperson cannot recommend a security unless there is an adequate and reasonable basis for such recommendation. By his recommendation he implies that a reasonable investigation has been made and that his recommendation rests on the conclusions based on such investigation.

Where the salesperson lacks essential information about a security, he should disclose

> this as well as the risks which arise from his lack of information. A salesperson may not rely blindly upon the issuer of the security for information concerning a company.

Moore argues that Instruction 50 imposed criminal liability for behavior that amounted to recklessness and directed the jury that "it had to convict" him of securities fraud if it found that he failed to satisfy a "'duty to investigate' or 'duty to know.'" We agree.

¶10 Instruction 50 has essentially supplanted the actual elements of the securities fraud charges against Moore. Nowhere in the applicable statutory framework is there any language akin to Instruction 50 imposing criminal liability for acts amounting to willful blindness or a violation of a duty to know. *See State v. Johnson*, 2009 UT App 382, ¶ 42, 224 P.3d 720 ("[T]he plain language of section 61-1-1(2) . . . makes no mention of an affirmative duty to disclose in the absence of a prior[, misleading] statement."). Moreover, section 61-1-21 unambiguously reserves criminal liability for "willful" violations of the Utah Uniform Securities Act and decidedly does not allow criminal prosecution of an individual who, as Instruction 50 provides, "*recklessly* state[s] facts about matters of which he is ignorant." (Emphasis added.) *See* Utah Code Ann. § 61-1-21. Indeed, the use of the word "recklessly" in Instruction 50 is a clear indicator that the instruction is not appropriate in this criminal case. *See Larsen*, 865 P.2d at 1358 ("The plain language of section 61-1-21 requires that to be liable for a criminal violation of section 61-1-1(2), the defendant must have acted 'willfully' in misstating or omitting material facts.").

¶11 *Hanly v. Securities & Exchange Commission*, 415 F.2d 589 (2d Cir. 1969), the source of the language incorporated into Instruction 50, supports our conclusion. There, the Second

Circuit Court of Appeals indicated that a violation of a "duty to know" would not be sufficient to sustain even a civil action for a securities violation. *Id.* at 595–96. *Hanly* involved an appeal from an administrative proceeding initiated by the Securities and Exchange Commission (SEC), in which the SEC "barred" five securities salesmen "from further association with any broker or dealer" for having made "materially misleading" representations in the offer and sale of a particular stock. *Id.* at 592, 595. In its review of the SEC's decision, the Second Circuit recognized that the "petitioners have not been criminally charged, nor have they been sued for damages by their customers"; rather, the SEC initiated "private proceedings," at the close of which it revoked "each petitioner's privilege of being employed in the securities industry." *Id.* at 595 (emphasis omitted). It was "in this context" that the Second Circuit recognized that "[b]rokers and salesmen are under a duty to investigate and their violation of that duty brings them within the term 'willful' in the [federal securities] Act." *Id.* at 595–96 (citation and additional internal quotation marks omitted). The court explained that the petitioners were being held to such "strict" standards in light of a "special duty" imposed in that circuit "upon those who sell [the specific type of stock at issue] not to take advantage of customers in whom confidence has been instilled." *Id.* at 597. The court recognized that a securities dealer, by virtue of that position, "implicitly represents" to potential buyers that "he has an adequate basis for the opinions he renders." *Id.* at 596. The court also recognized the unique role of this implied warranty given the posture of the case, stating, "[T]his implied warranty may not be as rigidly enforced in a civil action where an investor seeks damages for losses allegedly caused by reliance upon his unfounded representations . . . ." *Id.*

¶12 Thus, *Hanly* is applicable to only a small class of specialized securities cases initiated by the SEC in an administrative setting, and the Second Circuit recognized that

the standards imposed on the petitioners in that case were not appropriate in a civil, let alone criminal, setting. Accordingly, *Hanly* does not provide an appropriate basis for a jury instruction in the case before us. *See State v. Larsen*, 865 P.2d 1355, 1360 (Utah 1993) (recognizing that "the Utah legislature has not required the courts to interpret the Utah Uniform Securities Act in lockstep with federal decisions"). The broad language of Instruction 50 essentially imposes criminal liability for conduct that in *Hanly* was sufficient to sustain an administrative action, not a criminal action or even a civil action. *See Larsen*, 856 P.2d at 1360 (explaining that willfulness is a "highly culpable mental state" and "is not consistent with 'strict liability'"). Likewise, Instruction 50 raises the specter of a knowledge or scienter requirement, which Utah courts have specifically and repeatedly rejected in the context of criminal prosecutions under the Utah Uniform Securities Act. *See, e.g.*, *id*. at 1360 & n.8 ("[A] finding of scienter is not a prerequisite to criminal liability under section 61-1-1(2) . . . ."); *State v. Wallace*, 2005 UT App 434, ¶¶ 12–15 & n.6, 124 P.3d 259 (encouraging the legislature to weigh in on whether a defendant's knowledge of the facts underlying a securities violation should factor into a finding of willfulness, i.e., whether the defendant acted "'deliberately and purposefully'"), *aff'd*, 2006 UT 86, 150 P.3d 540.[2] This is far from the particularized unlawful conduct and

---

2. We echo this court's sentiment in *State v. Wallace* that guidance from the legislature on this issue would be helpful. *See* 2005 UT App 434, ¶ 15 n.6, 124 P.3d 259, *aff'd*, 2006 UT 86, 150 P.3d 540. After all, a "fundamental purpose" behind the securities reforms that occurred after "the stock market crash of 1929 and the depression of the 1930s" "was to substitute a philosophy of full disclosure for the philosophy of caveat emptor." *Securities & Exch. Comm'n v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 186 (1963).

standard of willfulness required by the Utah Code. *Cf. State v. Chapman*, 2014 UT App 255, ¶ 11, 338 P.3d 230 (describing the willfulness instruction as including a defendant's "conscious[] avoid[ance of] the existence of a fact or facts" or a "conscious objective or desire to ignore a material fact or facts" and distinguishing this from actions that are "merely negligent, careless, or foolish" (internal quotation marks omitted)); *State v. Bushman*, 2010 UT App 120, ¶ 19, 231 P.3d 833 ("[T]he actions for which the [Securities] Act imposes administrative sanctions—violations of Utah securities laws—do not constitute criminal behavior under the Act unless undertaken with the appropriate mental state.").

¶13 "[A]n error in jury instructions that was properly preserved at the trial level is reversible only if a review of the record persuades the court that without the error there was a reasonable likelihood of a more favorable result for the defendant."[3] *State v. Crowley*, 2014 UT App 33, ¶ 17, 320 P.3d 677

---

3. Moore urges that we apply the "higher standard of scrutiny" that is available when an "error results in the deprivation of a constitutional right." *See State v. Calliham*, 2002 UT 86, ¶ 45, 55 P.3d 573. Under this higher standard, we must reverse the "conviction unless we find the error harmless beyond a reasonable doubt." *Id*. In contrast, under the standard we generally apply, we may reverse a conviction "only if a review of the record persuades the court that without the error there was a reasonable likelihood of a more favorable result for the defendant." *State v. Crowley*, 2014 UT App 33, ¶ 17, 320 P.3d 677 (citation and internal quotation marks omitted). Because we conclude that the errors here satisfy the lower, "reasonable likelihood" standard for reversal, we need not separately consider the harmless-beyond-a-reasonable-doubt standard. Moreover, Moore has not demonstrated that an error in an

(continued…)

(citation and internal quotation marks omitted). The State asserts that Instruction 50 "was not key to the State's case" and that any error in the instruction was harmless in light of the "overwhelming" evidence that Moore "knew" he was omitting or misstating material information to investors and acting without the proper license. Moore asserts that the State utilized the standard outlined in Instruction 50 to its advantage by presenting the case to the jury as both "a material omission case" and a "duty to investigate case," and he cites examples from the State's closing argument describing Moore as having a "duty to know this stuff," the "onus . . . [to] do what you need to do to make sure you don't hurt people," and the "legal obligation to make sure that [the] things [he is] telling [an investor] are true."

¶14 We agree with Moore that Instruction 50 greatly distorted the willfulness element required for a conviction on eight of the nine charges against Moore. While Instruction 50 is framed in

---

(…continued)

elements instruction, even one going to the mental state of the accused, is an error of constitutional dimension shifting to the State the burden of showing that the error was harmless beyond a reasonable doubt. *See Chapman v. California*, 386 U.S. 18, 24 (1967). On the contrary, our supreme court consistently evaluates errors in defining the mens rea element under the non-constitutional standard for prejudice. *See State v. Powell*, 2007 UT 9, ¶¶ 2, 19, 154 P.3d 788 ("Although the jury instruction regarding mens rea was erroneous, the error was harmless."); *State v. Casey*, 2003 UT 55, ¶¶ 43, 46, 82 P.3d 1106 (holding that the trial court erred in instructing the jury that attempted murder can be committed "knowingly," but that "no harm resulted" in the case); *State v. Fontana*, 680 P.2d 1042, 1049 (Utah 1984) (holding that any error in the mens rea instruction "was not prejudicial and cannot serve as the basis for reversal").

terms particularly relevant to the securities fraud charges, we are nonetheless convinced that Instruction 50's definition of willfulness also distorted the requirements for a conviction on the unlicensed agent charges where willfulness is also an element of those charges. Instruction 50 replaced the statutory requirement of willfulness with a recklessness standard that ought to remain confined to the type of administrative setting from which it came. Instructions 23 and 43 do not alleviate our concerns with Instruction 50, as discussed further below. *See State v. Maestas*, 2012 UT 46, ¶ 148, 299 P.3d 892 ("[W]e look at the jury instructions in their entirety and will affirm when the instructions taken as a whole fairly instruct the jury on the law applicable to the case." (citation and internal quotation marks omitted)). As a result, the jury was not instructed properly on a necessary element required to sustain Moore's convictions of counts one through eight. An error in the jury instructions that relieves the State of its burden of proof with respect to a contested element is not harmless. *Crowley*, 2014 UT App 33, ¶ 19. Accordingly, we reverse Moore's convictions on those counts. Because the State needed to establish a pattern of unlawful activity for count nine by demonstrating that Moore committed at least one of the acts alleged in counts one through eight, our reversal of those convictions requires that we reverse his conviction on that charge as well.

B.     Instructions 23 and 43

¶15     Next, Moore challenges Instructions 23 and 43. Instruction 23 provides general definitions of the applicable mental states, including a definition of "intent": "A person engages in conduct intentionally or with intent or willfully with respect to the nature of his conduct or to a result of his conduct, when it is his conscious objective or desire to engage in the conduct or cause the result." Instruction 23 is derived from the Utah Criminal Code. *See* Utah Code Ann. § 76-2-103(1) (LexisNexis 2012)

(providing general definitions for what it means for a person to engage in conduct intentionally, knowingly, recklessly, or with criminal negligence). We do not consider Instruction 23's language to be problematic, but we agree with Moore that, on its own, Instruction 23 does not adequately instruct the jury on willfulness in this situation, nor does it offer much clarity when read in conjunction with Instruction 43. Instruction 43 states,

> A defendant acts willfully if it was his conscious objective or desire to engage in the conduct or cause the result—not that it was the defendant's conscious desire or objective to violate the law, nor that the defendant knew that he was committing fraud in the sale of the security.

¶16    Moore argues that Instructions 23 and 43 include language from *State v. Larsen*, 865 P.2d 1355 (Utah 1993), that is beneficial to the State but detrimental to Moore. Specifically, Moore argues that Instructions 23 and 43 "omitted *Larsen*'s clarifying language." Moore asserts that the language of these two instructions allowed the jury to reach a guilty verdict if it found that he had a "conscious objective or desire to engage in conduct such as signing thank you letters or distributing paperwork" and that it could do so "without regard to whether he engaged in the conduct with a conscious objective or desire to misstate a material fact, omit a material fact necessary to complete a predicate statement, or engage in an act that operated as a fraud."

¶17    The "clarifying language" from *Larsen* that Moore references is the supreme court's statement,

> To act willfully in this context means to act deliberately and purposefully, as distinguished from merely accidentally or inadvertently. Willful,

> when applied to the intent with which an act is done or omitted, implies a willingness to commit the act, which, in this case, is the misstatement or omission of a material fact. Willful does not require an intent to violate the law or to injure another or acquire any advantage.

*Id.* at 1358 n.3 (citation omitted). The *Larsen* court rejected concerns that the willfulness requirement would result in "accounting firms and other professionals [being] held liable for 'good faith oversight' or failure 'to discover and disclose a material fact.'" *Id.* at 1360. The *Larsen* court explained "that the prosecution must prove beyond a reasonable doubt that the accused 'desire[d] to engage in the conduct or cause the result,'" in order to limit liability for "only those professionals who willfully omit or misstate material facts." *Id.* (alteration in original) (citation and internal quotation marks omitted). Put differently, *Larsen* requires that Moore's fraud convictions rest on facts indicating, for example, that he "made a willful misstatement or omission of a material fact" by having "consciously avoided the existence of a fact or facts" or, in other words, that Moore "acted with a conscious objective or desire to ignore a material fact or facts," *see Chapman*, 2014 UT App 255, ¶ 11 (internal quotation marks omitted), not that he simply had a "conscious objective or desire to" sign thank you letters.

¶18 Nonetheless, because we are reversing Moore's convictions based on our analysis of Instruction 50, we need not decide whether Instructions 23 and 43 were prejudicially misleading or incomplete. *See Crowley*, 2014 UT App 33, ¶ 17, 320 P.3d 677 (explaining when errors in jury instructions warrant reversal). Instead, we encourage the trial court on remand to revisit the proper framing of "willfulness" in the jury instructions, paying special attention to the problems identified

with Instruction 50 and to whether the inclusion of additional, potentially "clarifying language" from *Larsen* would aid the jury.

## II. Issues that May Arise on Remand[4]

¶19 Although we reverse Moore's convictions and remand the case for further proceedings based on the language of Instruction 50, there are additional, fully briefed issues before this court that may arise on remand. I would therefore have this court exercise its "discretion to address those issues for purposes of providing guidance on remand." *State v. Low*, 2008 UT 58, ¶ 61, 192 P.3d 867.

### A.    Expert Testimony

¶20    Moore challenges Lloyd's expert testimony as including legal conclusions, statements as to whether Moore's actions were illegal, and incorrectly defined terms of art.[5]

---

4. Part II of the decision is not a part of the majority opinion to the extent Judge Voros and Judge Pearce disagree with the propriety of reaching the issues that may arise on remand in this case.

5. Moore also challenges another expert as having impermissibly compared VesCor to Bernie Madoff and described VesCor as a Ponzi scheme, despite the court's order that the parties and witnesses refrain from mentioning Bernie Madoff. Moore argues that his trial counsel's failure to object to this testimony constituted ineffective assistance. To the extent Moore opposes any future reference to Bernie Madoff or a Ponzi scheme that an expert witness may make in a subsequent retrial, his counsel is invited to make a proper objection at that time.

¶21    Expert witnesses may testify in the form of an opinion and may offer opinion testimony on ultimate issues. *See* Utah R. Evid. 702(a), 704(a). However, "[i]n a criminal case, an expert witness must not state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense." *Id.* R. 704(b).

> "Rules 701 and 702 require, respectively, that the opinions of lay and expert witnesses assist the trier of fact. And Rule 403 provides for the exclusion of evidence which wastes time. Thus, if a witness's opinion will do little more than tell the jury what result to reach, it will be inadmissible."

*Davidson v. Prince*, 813 P.2d 1225, 1232 n.7 (Utah Ct. App. 1991) (quoting 10 J. Moore & H. Bendix, *Moore's Federal Practice* § 704.02, at VII-63 (1989)). "No 'bright line' separates permissible ultimate issue testimony under rule 704 and impermissible 'overbroad legal responses' a witness may give during questioning." *State v. Davis*, 2007 UT App 13, ¶ 16, 155 P.3d 909 (citation omitted) (collecting cases in which the reviewing court attempted to draw the line between inadmissible and admissible rule 704 testimony).

¶22    Nonetheless, this court has recognized that expert witnesses who "tie their opinions to the requirements of Utah law" are "quite clearly" offering impermissible legal conclusions. *State v. Tenney*, 913 P.2d 750, 756 (Utah Ct. App. 1996); *see also, e.g., Specht v. Jensen*, 853 F.2d 805, 806 (10th Cir. 1988) (concluding that it is beyond the scope of permissible expert testimony for an expert witness "to state his views of the law which governs the verdict and opine whether defendants' conduct violated that law"); *Hogan v. American Tel. & Tel. Co.*, 812 F.2d 409, 411 (8th Cir. 1987) (per curiam) ("Opinion testimony is not helpful to the factfinder if it is couched as a legal conclusion

. . . . Because the judge and not a witness is to instruct the factfinder on the applicable principles of law, exclusion of opinion testimony is appropriate if the terms used have a separate, distinct, and special legal meaning." (citations omitted)); *State v. Stringham*, 957 P.2d 602, 607 (Utah Ct. App. 1998) (determining that the prosecutor's "hypothetical question" posed to an expert witness that "consist[ed] of the exact actions of which [the] defendant was accused" required the witness to offer an impermissible legal conclusion); *Davidson*, 813 P.2d at 1231 (collecting cases and affirming the trial court's decision to exclude expert testimony that would have answered a specific question on the verdict form that the jury needed to answer "based upon the judge's definition of a legal term 'negligence'"). Other jurisdictions have determined that expert witness testimony "'that encompasses an ultimate issue is generally admissible when it alludes to an inference that the trier of fact should make, or uses a term that has both a lay factual meaning and legal meaning, and it is clear that the witness is using only the factual term.'" 5 *Handbook of Fed. Evid*. § 704:1 (7th ed.) (quoting *Webb v. Omni Block, Inc.*, 166 P.3d 140, 144 (Ariz. Ct. App. 2007)).

¶23    I am particularly troubled by Lloyd's testimony defining the terms "willful," "material information," "agent," and "securities" and applying the terms "agent" and "securities" to the facts of Moore's case. I address Moore's argument with respect to each of these definitions in turn.

1.  Willfulness

¶24    Moore argues that Lloyd incorrectly defined the term "willfulness" and that Lloyd's use of the term amounted to an impermissible legal conclusion. Lloyd testified, "In the context of securities, willful means an intent to take an action." Lloyd explained that criminal liability requires only that the defendant

"have . . . intend[ed] to take the particular action" and that "it doesn't necessarily mean that they have an intent to defraud. It just means they have an intent to sell the security, distribute the paperwork, whatever it is that . . . involves the offer or sale of a security." Moore also argues that Lloyd offered legal conclusions when he "expounded on the definition of 'willfulness'" by testifying "about the legal meaning of 'reckless statement.'" Lloyd testified that "a reckless statement . . . in the securities industry . . . is a statement that's made in disregard of a particular risk or series of risks or consequences or outcomes." He further explained, "[T]o make a reckless statement is to make a statement knowing that maybe there are risks or there are consequences that affect that statement that you're . . . going ahead despite those risks."

¶25 Given our ruling on the willfulness instructions, I am inclined to agree with Moore that Lloyd's testimony defining the term "willfulness" as it is used "[i]n the context of securities" law was admitted in error. To avoid this problem on remand, expert witnesses should restrict their testimony defining terms of art to definitions that are clearly based on the expert's understanding and experience in the industry, rather than the expert's understanding of Utah law.[6] *See Tenney*, 913 P.2d at 756.

2. Material Information

¶26 Moore claims that Lloyd impermissibly stated a legal conclusion when he testified that "information is material if a reasonable person would consider it important in making a decision as to whether or not to purchase that particular security." Moore also asserts that "Lloyd's examples of material

---

6. I do not express an opinion on whether the testimony I consider erroneously admitted also constituted prejudicial error.

information mirrored the State's allegations." Last, Moore argues that Lloyd indicated that a seller of securities is required to "disclose all material information."

¶27   I am not troubled by Lloyd's definition of "material information." His definition was broad and not couched in terms of Utah law or the facts of Moore's case. *Cf. State v. Chapman*, 2014 UT App 255, ¶ 21, 338 P.3d 230 (declining to find error in an expert's testimony defining what a security is in general because the expert "did not tell the jury that the transaction at issue was a security, couch his opinion specifically in terms of what is required under Utah law, or otherwise tell the jury what conclusion to reach"). Lloyd's list of examples of material information was similarly generalized and did not explicitly mirror the State's allegations. *Cf. State v. Stringham*, 957 P.2d 602, 607 (Utah Ct. App. 1998). *But see Chapman*, 2014 UT App 255, ¶¶ 28–29, 32–34 (Pearce, J., concurring in part and concurring in the result) (explaining that because "the questions presented to the jury concerning materiality in this case were straightforward," the expert's testimony on this point was "well within the experience of the average layperson" and therefore not helpful); *id.* ¶ 25 (Roth, J., concurring) (writing separately to share in "Judge Pearce's concerns regarding the admissibility of the State's expert testimony with respect to the materiality" element). Last, it was the prosecutor, not Lloyd, who implied that a seller of securities has a duty to disclose all material information. Lloyd responded broadly to the prosecutor's question and did so without indicating whether such a duty to disclose necessarily exists. However, in conjunction with the problems we identified in Instruction 50, I am concerned that this statement and the statement's implication of a scienter requirement were not appropriate.

3. Agent and Security

¶28     Lloyd defined the term "agent" as "a person that effects or attempts to effect a purchase or sale of security on . . . behalf of an issuer. So someone acting on behalf of an issuer in attempting or effecting a purchase or sale of securities." He provided the same definition later in his testimony and added, "[A]s we've learned in the course of the last couple of days, there's no question in my mind, in my experience that the activities that have been described would be considered [effecting] or attempting to [effect] purchases or sales of securities."[7]

¶29     Similarly, Lloyd defined various types of "securities" and testified that the transactions at issue were securities. Lloyd offered his "opinion" that the documents and transactions at issue in this case constituted securities, he identified particular characteristics of the transactions that made them securities, and he then identified what types of securities the transactions were.

¶30     Although Lloyd's definition of "agent" is similar to the definition provided in the jury instructions, I am nonetheless troubled that his testimony addressed an element that the jury needed to find for the licensing charges and "suppl[ied] the jury with no information other than [his] view of how its verdict should read." *See Owen v. Kerr–McGee Corp.*, 698 F.2d 236, 240

---

7. In a footnote, Moore also challenges another expert's testimony describing the licensing requirements for sellers of securities and that expert's testimony describing Moore as not licensed to sell securities. However, Moore stipulated that he did not have a license, and the witness did not explicitly opine that Moore was a seller of securities and was therefore required to be licensed.

(5th Cir. 1983); *see also Davidson v. Prince*, 813 P.2d 1225, 1231 (Utah Ct. App. 1991). The fact that Lloyd explained what securities are is not necessarily problematic. But I am concerned that his testimony went too far by defining securities using the facts of this case as illustrative examples of what constitutes a security. *Cf. Chapman*, 2014 UT App 255, ¶ 20.

B.      Restitution

¶31    Last, Moore argues that the trial "court abused its discretion by (1) refusing to consider the mandatory factors for court-ordered restitution . . . and (2) ordering Moore to pay restitution for" the time-barred investments.

¶32    "Restitution should be ordered only in cases where liability is clear as a matter of law and where commission of the crime clearly establishes causality of the injury or damages." *State v. Laycock*, 2009 UT 53, ¶ 29, 214 P.3d 104 (citation and internal quotation marks omitted). The applicable statutory framework lists six factors the court must consider in "determining the monetary sum and other conditions for court-ordered restitution," which includes considering six additional conditions listed in the statute under the requirements for complete restitution. *See* Utah Code Ann. § 77-38a-302(5)(b)–(c) (LexisNexis Supp. 2014).

¶33    While I need not conduct a complete analysis of these restitution arguments, I agree that the reasoning relied on by the trial court in ordering court-ordered restitution could have been clearer, more explicit, and more detailed. In its analysis of court-ordered restitution, the court considered only Moore's educational background and work history and did so fairly cursorily. Indeed, the court addressed Moore's work history in securities favorably, implying that once he finishes his prison

term for nine convictions of securities crimes, he could return to the industry and earn a "pretty substantial income."

¶34   Moore also raises legitimate concerns regarding the trial court's inclusion of the time-barred investments in its calculation of the restitution award because "[t]he statute requires that responsibility for the criminal conduct be firmly established, much like a guilty plea, before the court can order restitution." *State v. Mast*, 2001 UT App 402, ¶ 18, 40 P.3d 1143 (citation and internal quotation marks omitted). As discussed above, the jury did not need to rely on the time-barred investments in order to convict Moore of engaging in a pattern of unlawful activity and Moore was otherwise not charged and convicted of securities violations for these investments because the statute of limitations had run on them. Rather than address whether the inclusion of these investments amounted to error, I encourage the parties and the court on remand to take measures that may prevent this concern from reappearing, e.g., using a special verdict form.

## CONCLUSION

¶35   Instruction 50 incorrectly imposed a duty to know and a duty to disclose on securities sellers that is not an element in Utah criminal securities law and undermines the willfulness element required to sustain the four securities fraud charges and four unlicensed agent charges brought against Moore. Accordingly, we reverse Moore's convictions on those eight charges and his conviction for engaging in a pattern of unlawful activity.[8]

──────────

8. We do not address Moore's separate argument for reversal based on cumulative error.